IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-133

No. 407A21

Filed 16 December 2022

QUAD GRAPHICS, INC.

v.

N.C. DEPARTMENT OF REVENUE

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from the order and opinion entered on 23 June 2021 by Judge Gregory P. McGuire, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, granting summary judgment in favor of petitioner after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 30 August 2022.

> *Akerman, LLP, by Michael J. Bowen, pro hac vice; and Douglas W. Hanna for petitioner-appellee.*
>
> *Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, and Ashley Hodges Morgan, Special Deputy Attorney General, for respondent-appellant.*
>
> *Poyner Spruill LLP, by Caroline P. Mackie; and Caroline S. Van Zile, Principal Deputy Solicitor General for the District of Columbia, for Steve Marshall, Attorney General for the State of Alabama, Treg R. Taylor, Attorney General for the State of Alaska, Philip J. Weiser, Attorney General for the State of Colorado, Karl A. Racine, Attorney General for the District of Columbia, William Tong, Attorney General for the State of Connecticut, Lawrence G. Wasden, Attorney General for the State of Idaho, Kwame Raoul, Attorney General for the State of Illinois, Theodore E. Rokita, Attorney General for the State of Indiana, Thomas J. Miller, Attorney General for the State of Iowa, Brian E. Frosh, Attorney*

*General for the State of Maryland, Maura Healey, Attorney General for the Commonwealth of Massachusetts, Keith Ellison, Attorney General for the State of Minnesota, Aaron D. Ford, Attorney General for the State of Nevada, Andrew J. Bruck, Acting Attorney General for the State of New Jersey, Hector Balderas, Attorney General for the State of New Mexico, Letitia James, Attorney General for the State of New York, Wayne Stenehjem, Attorney General for the State of North Dakota, Josh Shapiro, Attorney General for the Commonwealth of Pennsylvania, Peter F. Neronha, Attorney General for the State of Rhode Island, Thomas J. Donovan Jr., Attorney General for the State of Vermont, and Robert W. Ferguson, Attorney General for the State of Washington, amici curiae.*

*Q Byrd Law, by Quintin D. Byrd; and Richard Cram, pro hac vice, for Multistate Tax Commission, amicus curiae.*

*William W. Nelson for North Carolina Chamber Legal Institute, amicus curiae.*

MORGAN, Justice.

Respondent appeals from the Business Court's decision, in which the tribunal had concluded that the sales of printed materials produced by Wisconsin-based petitioner out of state and shipped to its customers and their designees located within North Carolina lacked a sufficient nexus to North Carolina for the imposition of state sales tax under the Commerce Clause of the Constitution of the United States in light of the Supreme Court of the United States' decision in *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327 (1944). The question we are tasked with answering on appeal is whether *Dilworth* remains controlling precedent in this case or if subsequent Supreme Court decisions supersede *Dilworth*'s holding and provide an alternative method for determining the constitutionality of North Carolina's sales tax regime. Because *Complete Auto Transit Inc. v. Brady,* 430 U.S. 274 (1977), provides the relevant

modern test for the imposition of a state tax on interstate commerce and because *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018), applies this test to a tax regime materially identical to that of North Carolina without regard for *Dilworth*'s holding, we hold in favor of respondent and reverse the Business Court's decision below.

## I.     Factual and Procedural Background

The facts of this case are neither particularly complicated nor in dispute. Petitioner is an S-Corporation headquartered in Sussex, Wisconsin. Petitioner is engaged in the production and sale of printed materials, including books, magazines, catalogs, and other items, for distribution across the United States. Between 2009 and 2011, petitioner processed approximately $20 million worth of orders for delivery to customers or third-party recipients located in North Carolina. Petitioner's materials are printed at commercial printing facilities throughout the United States, but no such facility was located in North Carolina during the time period at issue. After producing the purchased materials at a facility located out of state, petitioner would deliver customers' orders to the United States Postal Service or another common carrier located outside of North Carolina for delivery to in-state customers or their third-party representatives. According to its sales contracts, possession, legal title, and risk of loss for any ordered materials passed from petitioner to its customers when those materials were delivered to carriers outside of North Carolina. Petitioner employs sales representatives throughout the United States. Beginning in September

2009, petitioner employed a sales representative in North Carolina who solicited sales to customers both inside and outside of the state.

¶ 3    Respondent North Carolina Department of Revenue is an agency of the State of North Carolina which administers the state's tax collection system. In 2011, respondent conducted an audit related to petitioner's collection of sales and use tax within North Carolina for the period between 1 January 2007 and 31 December 2011. On 12 November 2015, respondent issued a Notice of Proposed Sales and Use Tax Assessment finding petitioner liable for uncollected and unremitted sales tax for sales to North Carolina customers between 1 January 2007 and 31 December 2011. Petitioner appealed respondent's Notice of Assessment through respondent's departmental review process. Upon review, respondent found that petitioner was a retailer engaged in business in North Carolina as it maintained a resident employee to solicit sales and service customer accounts within the state. Respondent also found that petitioner had failed to establish that its customers took possession of purchased materials outside of North Carolina and, as such, concluded that the sales were properly sourced to the state under North Carolina's sourcing statute N.C.G.S. § 105-164.4B, since the materials were received by petitioner's customers or their designees within the state.[1] However, respondent found that the Department had been unable

---

[1] Section 105-164.4B of the North Carolina General Statutes provides sourcing principles for the imposition of sales tax on sellers of goods delivered to in-state purchasers or their designees. In relevant part, the statute provides that "[w]hen a purchaser receives a

to establish that petitioner had sufficient business activity in North Carolina to create the nexus for the imposition of sales and use tax prior to September 2009 based on petitioner's lack of physical presence in the state until that time. On 30 November 2018, after removing sales predating September 2009 as well as other exempt transactions and adjusting the assessment accordingly, respondent issued a Notice of Final Determination upholding the imposition of uncollected and unremitted sales tax in the amount of $3,238,022.52 from sales made between 1 September 2009 and 31 December 2011.

On 28 January 2019, petitioner appealed respondent's Notice of Final Determination and filed a petition with the Office of Administrative Hearings (OAH) advancing the following arguments: (I) that the disputed transactions were not subject to North Carolina retail sales or use tax because all relevant aspects of the transactions took place outside of the state, (II) that the assessment of North Carolina sales and use tax on these transactions violated the Due Process Clause and Commerce Clause of the Constitution of the United States, and (III) that the specific transactions included in respondent's assessment should have been excluded or were

---

product at a location specified by the purchaser . . . , the sale is sourced to the location where the purchaser receives the product[,]" N.C.G.S. § 105-164.4B(a)(2) (2009), and that "[d]irect mail . . . is sourced to the location where the property is delivered" when "the purchaser provides the seller with information to show the jurisdictions to which the direct mail is to be delivered[,]" N.C.G.S. § 105-164.4B(d)(2) (2009). This is known as "destination-based" sourcing, which defines the site of a sale of tangible property based on the item's destination and has been adopted by a majority of the states.

otherwise exempt from North Carolina sales and use tax. Petitioner removed Claim III from its petition but pursued Claims I and II before the OAH. On 24 June 2020, after petitioner and respondent filed cross-motions for summary judgment, Administrative Law Judge Melissa Owens Lassiter entered a Final Decision granting respondent's motion for summary judgment and dismissing petitioner's case with prejudice.

¶ 5        The OAH's Final Decision held that petitioner was a "retailer" as defined by N.C.G.S. § 105-164.3(35)(a) and was therefore obligated to collect and remit sales tax pursuant to N.C.G.S. §§ 105-164.8 and 105-164.4B. Furthermore, although the OAH acknowledged that it "has not been given jurisdiction to determine the constitutionality of legislative enactments[,]" quoting *In re Redmond*, 369 N.C. 490, 493 (2017), it opined that petitioner had sufficient nexus with North Carolina for respondent to impose sales tax on the sales in question. Finally, the Final Decision announced that the sales at issue were properly sourced to North Carolina as set forth in the state's sourcing statute. *See* N.C.G.S. § 105-164.4B(a)(2), (d)(2) (2009).

¶ 6        On 24 July 2020, petitioner petitioned for judicial review of the OAH's Final Decision to the Business Court pursuant to N.C.G.S. § 105-241.16, designating the case as a mandatory complex business case pursuant to N.C.G.S. § 7A-45.4. The matter was assigned to the Honorable Louis A. Bledsoe III, Chief Business Court Judge on the same day. On 20 August 2020, petitioner filed an Amended Petition for

Judicial Review. On 24 September 2020, the parties stipulated to the official record of the proceedings at the OAH. On 2 October 2020, the Business Court issued an Order and Opinion on various motions filed by the parties, including a denial of respondent's motion to dismiss petitioner's amended petition for judicial review. Between 26 October 2020 and 10 December 2020, the parties filed their briefs, responses, and replies with the Business Court. On 6 January 2021, the case was reassigned to the Honorable Gregory P. McGuire, Special Superior Court Judge for Complex Business Cases. The parties appeared for a hearing on 2 February 2021. On 27 May 2021, the Business Court issued a Notice to Provide Supplemental Briefing; in response, the parties filed supplemental briefs on 11 June 2021.

¶ 7    On appeal before the Business Court, petitioner argued that (1) the OAH erred in holding that petitioner was a "retailer" under the provisions of N.C.G.S. § 105-164.3(35)(a) that was required to pay sales tax to North Carolina on the sales at issue under the provisions of the Act, and (2) respondent's assessment of sales tax on the sales at issue was unconstitutional under the Due Process Clause and Commerce Clause of the Constitution of the United States. On 23 June 2021, the Business Court held in favor of petitioner, reversing the OAH's Final Decision and granting summary judgment in favor of petitioner. The Business Court first considered petitioner's argument that it was misclassified as a "retailer" under N.C.G.S. § 105-164.3(35) because the transfer of title and possession to the printed materials took place outside

of North Carolina and a person must make sales "in this State" to be classified as a retailer under the statute. *See* N.C.G.S. § 105-164.3(35) (2009). The Business Court rejected this argument, concluding that the OAH had correctly held that petitioner was a "retailer" within the meaning of N.C.G.S. § 105-164.3(35). This issue has not been briefed to this Court and is not the subject of our review.

¶ 8      The Business Court next considered petitioner's contention that North Carolina's imposition of sales tax on the sales at issue—where title and possession of the printed materials arguably transferred to purchasers and third-party recipients located in North Carolina before the materials entered the state—was unconstitutional under the Commerce Clause of the Constitution of the United States in light of the Supreme Court's decision in *Dilworth*. The Business Court discredited respondent's assertion that the decisions of the Supreme Court of the United States in *Complete Auto* and *Wayfair* overruled *Dilworth* formalism, and therefore concluded that *Dilworth* remains controlling precedent in this case. The Business Court accordingly granted summary judgment to petitioner on the basis that North Carolina did not have a sufficient nexus with the sales at issue under the Commerce Clause to impose sales tax on them, reversing the OAH's Final Decision. On 1 July 2021, the matter was reassigned to the Honorable Mark A. Davis, Special Superior Court Judge for Complex Business Cases. On 22 July 2021, respondent filed a notice of appeal directly to this Court pursuant to N.C.G.S. § 7A-27(a)(2). On the same day,

respondent filed a motion to stay execution of the Business Court's 23 June 2021 Order and Opinion with the Superior Court pending the outcome of this appeal. The trial court granted this motion on 5 October 2021.

## II. Analysis

¶ 9 Appeals arising from orders granting summary judgment are decided under a de novo standard of review. *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014). Under this standard, the Court considers the matter anew and freely substitutes its judgment for that of the lower court or administrative agency. *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 257 (2016); *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 660 (2004). Since the Business Court granted summary judgment to petitioner, we shall consider the questions of law underlying the decision anew and freely substitute our own judgment for the conclusion of the Business Court. The sole question before this Court is whether the holding of the Supreme Court of the United States in *Dilworth* controls the outcome of the case at bar. Based on the high court's subsequent decisions in *Complete Auto* and *Wayfair*, we hold that *Dilworth* does not govern the present case. We further conclude that North Carolina's imposition of sales tax on the purchases at issue in this case does not violate either the Commerce Clause or the Due Process Clause of the Constitution of the United States under the relevant modern test provided by *Complete Auto*.

**A. *Dilworth*'s status in modern Commerce Clause jurisprudence**

¶ 10      On 15 May 1944, the Supreme Court of the United States issued its opinions in both *Dilworth* and *Dilworth*'s companion case *General Trading Co. v. State Tax Comm'n*, 322 U.S. 335 (1944). In *Dilworth*, the Supreme Court determined that the state of Arkansas had no authority under the Commerce Clause of the Constitution of the United States to impose a tax on the sale of machinery or mill supplies purchased from Tennessee corporations which did not have any offices, branches, or other places of business located within Arkansas, where title passed upon delivery to a common carrier within Tennessee before the goods were ultimately brought into Arkansas for delivery to Arkansas customers. *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330 (1944). Since these sales were, in the high court's view, "consummated in Tennessee for the delivery of goods in Arkansas[,]" Arkansas could not tax them without "project[ing] its powers beyond its boundaries and . . . tax[ing] an interstate transaction." *Id.* at 328, 330. As such, the Supreme Court determined that Arkansas was prohibited from doing so under the then-prevailing interpretation of the Commerce Clause as categorically barring states from taxing interstate commerce, which was seen as residing within the exclusive province of Congress. *Id.* at 330.

¶ 11      Meanwhile, in *General Trading*, the Supreme Court of the United States upheld the imposition of an Iowa use tax levied against property brought into Iowa from the state of Minnesota for customers located within Iowa's boundaries even though the Minnesota company whose goods were subject to the tax and which was

required to collect and then to remit the tax back to Iowa maintained no offices or other places of business within the state. *General Trading*, 322 U.S. at 336. According to the Supreme Court in its opinion in *General Trading*, Iowa's imposition of a *use* tax did not tax the "privilege of doing interstate business," but rather the privilege of enjoying one's property within the state, regardless of its origin. *Id.* at 338. Requiring the Minnesota seller to collect the tax was, in the Supreme Court's view, simply a "familiar and sanctioned device" to implement a use tax against the ultimate consumer, an Iowa resident. *Id.* The high court thus justified Iowa's imposition of the tax on the grounds that:

> Of course, no State can tax the privilege of doing interstate business. That is within the protection of the Commerce Clause and subject to the power of Congress. On the other hand, the mere fact that property is used for interstate commerce or has come into an owner's possession as a result of interstate commerce does not diminish the protection which he may draw from a State to the upkeep of which he may be asked to bear his fair share.

*Id.* (citation omitted). As Justice Douglas noted in his dissent in *Dilworth*, however, the Supreme Court's categorical rejection of the imposition of state sales tax and its simultaneous countenance of a complementary use tax on the same transactions had no practical effect on the ability of states to tax the receipt of goods from out of state. *Dilworth*, 322 U.S. at 333–34 (Douglas, J., dissenting) ("But a use tax and a sales tax applied at the very end of an interstate transaction have precisely the same economic incidence. Their effect on interstate commerce is identical . . . there should be no

difference in result under the Commerce Clause where, as here, the practical impact on the interstate transaction is the same.").

¶ 12 The *Dilworth* majority addressed this apparent contradiction by acknowledging that, although a "sale[s] tax and a use tax in many instances may bring about the same result[,]" the two forms of tax "are different in conception, are assessments upon different transactions, and . . . may have to justify themselves on different constitutional grounds." *Id.* at 330. In particular, the high court's majority emphasized that a "sales tax is a tax on the freedom to purchase" whereas a "use tax is a tax on the enjoyment of that which was purchased." *Id.* A use tax, according to the Supreme Court, was imposed only after the sale "had spent its interstate character" and therefore did not amount to a taxation of interstate commerce itself. *Id.* at 331. The Supreme Court thus reasoned that only the imposition of interstate sales tax by the states was prohibited by the Commerce Clause:

> In view of the differences in the basis of these two taxes and the differences in the relation of the taxing state to them, a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of the goods sold, involves an assumption of power by a State which the Commerce Clause was meant to end. The very purpose of the Commerce Clause was to create an area of free trade among the several States.

*Id.* at 330. This "free trade" philosophy laid the groundwork for the subsequent decisions of the Supreme Court of the United States in cases such as *Freeman v. Hewit*, 329 U.S. 249, 252 (1946) (holding that the Commerce Clause does not "merely

forbid a State to single out interstate commerce for hostile action" but precludes it from "taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States"), and *Spector Motor Serv. v. O'Connor*, 340 U.S. 602, 603–10 (1951) (striking down a nondiscriminatory "privilege of doing business" franchise tax as imposed by Connecticut against a foreign corporation only engaged in interstate commerce on the basis that Congress has the exclusive power to tax the privilege of engaging in interstate commerce).

¶ 13        Nearly thirty years later, the Supreme Court began to disassociate its approach in this legal arena from the strict formalism that had characterized *Dilworth* and the *Dilworth* progeny. In 1977, the high court chose to expressly overrule *Freeman* and *Spector*, utilizing its opinion in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977) to disavow the "free trade" theory which was articulated in *Dilworth*. Complete Auto Transit, Inc. was a Michigan corporation contracted for the purpose of transporting motor vehicles manufactured by General Motors Corporation outside of the state of Mississippi from a railhead in Jackson, Mississippi to dealers throughout the state. *Id.* at 276. Complete Auto argued that Mississippi did not have authority to impose a sales tax upon its transportation services since the company was "but one part of an interstate movement" and therefore immune to state taxation under the precedent set by cases such as *Freeman* and *Spector*. *Id.* at 277–78. In *Complete Auto*, the Supreme Court acknowledged that *Freeman* and *Spector*

had "reflect[ed] an underlying philosophy that interstate commerce should enjoy a sort of 'free trade' immunity from state taxation[,]" but the high court opted to follow the path paved by more recent decisions considering "not the formal language of the tax statute, but rather its practical effect." *Id.* at 278–79. The Supreme Court criticized the *Spector* rule's "holding that a tax on the 'privilege' of engaging in an activity in the State may not be applied to an activity that is part of interstate commerce" as having "no relationship to economic realities[,]" and rejected its blanket prohibition against the imposition of a direct tax on interstate sales regardless of whether it was fairly apportioned or nondiscriminatory. *Id.*

¶ 14        The Supreme Court in *Complete Auto* "abandoned the abstract notion that interstate commerce 'itself' cannot be taxed by the States[,]" recognizing, in its place, that "interstate commerce may be required to pay its fair share of state taxes." *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 30–31 (1988). Alternatively, the high court elected to follow the line of cases sustaining taxes against Commerce Clause challenges where they "applied to an activity with a substantial nexus with the taxing State, [were] fairly apportioned, [did] not discriminate against interstate commerce, and [were] fairly related to the services provided by the State." *Complete Auto*, 430 U.S. at 279. This has become known as *Complete Auto*'s "four-part formulation" and provides the modern test for determining the constitutionality of a state tax imposed on interstate commerce regardless of its formal designation.

¶ 15     The *Complete Auto* test has since been applied to determine the constitutionality of various taxes levied against interstate commerce. *D.H. Holmes*, 486 U.S. at 30; *see, e.g., Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995), *superseded by statute on other grounds*. These cases have made clear that *Complete Auto*'s declaration required the rejection of outdated precedent that "proscribed all taxation formally levied upon interstate commerce" or encouraged legal gamesmanship by drawing artificial boundaries around taxes that differed in form but not substance. *Id.* at 183 ("[W]e categorically abandoned . . . [such] formalism when [*Complete Auto* . . .] overruled *Spector* and *Freeman*."); *see also Dep't of Revenue. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 745 (1978) ("Because the tax in the present case is indistinguishable from the taxes at issue in *Puget Sound* and in *Carter & Weekes* [prohibiting state taxation of the gross receipts of businesses involved in the unloading of interstate cargo vessels on the grounds that such taxes were prohibited by the Commerce Clause], the *Stevedoring Cases* control today's decision on the Commerce Clause issue *unless more recent precedent and a new analysis require rejection of their reasoning*. We conclude that *Complete Auto* . . . requires such rejection.") (emphasis added). *Cf. Quill Corp. v. North Dakota*, 504 U.S. 298, 310–11 (1992) ("*Complete Auto* rejected *Freeman* and *Spector*'s formal distinction between 'direct' and 'indirect' taxes on interstate commerce because that formalism allowed the validity of statutes to hinge on 'legal terminology,' 'draftsmanship and

phraseology.' " (citation omitted)), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018).

¶ 16   The *Dilworth*/*General Trading* dichotomy was exactly such a formalistic distinction that turned upon legal draftsmanship as opposed to differences in the practical effect of a use tax as compared to a sales tax. It would further appear that the Supreme Court of the United States has wholly abandoned the free trade theory which had provided for the distinction's unsteady foundation. *See Complete Auto*, 430 U.S. at 278–79. In the instant case, however, petitioner and its amicus curiae caution that this Court is not authorized to engage in an "anticipatory overruling" of Supreme Court precedent interpreting federal law, regardless of how "moth-eaten" its underlying logic has become. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the U.S. Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Nonetheless, there is no "magic words" requirement that must be used for the nation's premier legal forum to overrule its own precedent; indeed, it may implicitly overrule precedent by issuing a decision in direct contradiction with its prior holdings. *See Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344 (1954) ("Our decisions are not always clear as to the grounds on which a tax is supported, especially where more than one exists; nor are

all of our pronouncements . . . consistent or reconcilable. A few have been specifically overruled, while others no longer fully represent the present state of the law."). Where two precedents are flatly irreconcilable, the latter in time controls.

**B. *Wayfair*'s application of *Complete Auto* to North Dakota's sales tax regime**

¶ 17        We are in the fortuitous position of not having to discern whether *Dilworth* was automatically retained within the Supreme Court's decision in *Complete Auto* or whether we were compelled to engage in an anticipatory overruling of a federal precedent whose underlying logic has been abandoned but whose direct holding has never been specifically readdressed. Instead, we can confidently look to the application by the Supreme Court of the United States of the *Complete Auto* test to a materially identical tax regime in *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018) to guide our analysis. Since *Wayfair* is directly applicable to the case before us, its holding supersedes *Dilworth* to the extent that the two precedents are in conflict with one another and guide our own path forward.

¶ 18        *Wayfair* overruled a line of precedent which prohibited states from requiring sellers to collect and to remit state sales or use tax unless they maintained a physical presence within the state. *See Nat'l Bellas Hess, Inc. v. Dep't of Revenue*, 386 U. S. 753 (1967); *Quill Corp. v. North Dakota*, 504 U. S. 298 (1992). In 2016, the state of South Dakota enacted "An Act to provide for the collection of sales taxes from certain remote sellers, to establish certain Legislative findings, and to declare an emergency"

and invited the Supreme Court to reconsider this precedent in light of the fact that the modern proliferation of remote e-commerce vendors like Wayfair was "seriously eroding the sales tax base" and "causing revenue losses and imminent harm . . . through the loss of critical funding for state and local services." *Wayfair*, 138 S. Ct. at 2088 (alteration in original) (quoting S.B. 106, 2016 Leg. Assembly, 91st Sess. § 8(1) (S.D. 2016) (S.B. 106)). The Act required sellers who delivered more than $100,000 worth of goods to South Dakota customers or made more than 200 individual transactions for the delivery of goods into the state to collect and remit sales tax "as if [they] had a physical presence in the State." *Id.* at 2089 (quoting S.B. 106, § 1).

¶ 19        Wayfair challenged the South Dakota law under the Supreme Court's precedent in *Quill*, which affirmed the rule articulated in *Bellas Hess* that a state may not require a seller without any physical presence within the state to collect and remit sales or use tax for the sale of goods for delivery into the state. *Quill*, 504 U.S. 298. *Bellas Hess*, which was decided prior to the Supreme Court's decision in *Complete Auto*, held that requiring sellers "whose only connection with customers in the State [was] by common carrier or . . . mail" to collect and remit state use tax both "violate[d] the Due Process Clause of the Fourteenth Amendment and create[d] an unconstitutional burden upon interstate commerce[,]" in violation of the Commerce Clause. *Bellas Hess,* 386 U.S. at 756, 758. In *Quill*, the high court overturned the due process holding in *Bellas Hess* on the grounds that its "due process jurisprudence

ha[d] evolved substantially in the 25 years since *Bellas Hess*," abandoning

"formalistic tests" concerning a defendant's presence within the forum state for a

"more flexible inquiry into whether a defendant's contacts with the forum made it

reasonable . . . to require it to defend the suit in that State." *Quill*, 504 U.S. at 307.

The high court went on to say that:

> Comparable reasoning justifies the imposition of the collection duty on a mail-order house that is engaged in continuous and widespread solicitation of business within a State. Such a corporation clearly has "fair warning that [its] activity may subject [it] to the jurisdiction of a foreign sovereign." In "modern commercial life" it matters little that such solicitation is accomplished by a deluge of catalogs rather than a phalanx of drummers: The requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State. Thus, to the extent that our decisions have indicated that the Due Process Clause requires physical presence in a State for the imposition of duty to collect a use tax, we overrule those holdings as superseded by developments in the law of due process.
>
> In this case, there is no question that Quill has purposefully directed its activities at North Dakota residents, that the magnitude of those contacts is more than sufficient for due process purposes, and that the use tax is related to the benefits Quill receives from access to the State. We therefore agree with the North Dakota Supreme Court's conclusion that the Due Process Clause does not bar enforcement of that State's use tax against Quill.

*Id.* at 308 (alterations in original) (citation omitted). The Supreme Court did not,

however, overrule the holding in *Bellas Hess* that such an imposition was in violation

of the Commerce Clause. The high court distinguished the physical presence requirement in *Bellas Hess* from those distinctions articulated in other cases that had been overturned by its decision in *Complete Auto* by explaining that:

> *Complete Auto*, it is true, renounced *Freeman* and its progeny as "formalistic." But not all formalism is alike. *Spector*'s formal distinction between taxes on the "privilege of doing business" and all other taxes served no purpose within our Commerce Clause jurisprudence, but stood "only as a trap for the unwary draftsman." In contrast, the bright-line rule of *Bellas Hess* furthers the ends of the dormant Commerce Clause. Undue burdens on interstate commerce may be avoided not only by a case-by-case evaluation of the actual burdens imposed by particular regulations or taxes, but also, in some situations, by the demarcation of a discrete realm of commercial activity that is free from interstate taxation. *Bellas Hess* followed the latter approach and created a safe harbor for vendors "whose only connection with customers in the [taxing] State is by common carrier or the United States mail." Under *Bellas Hess*, such vendors are free from state-imposed duties to collect sales and use taxes.

*Id.* at 314–15 (alteration in original) (citations omitted). Instead, the Court in *Quill* held that *Complete Auto* had incorporated *Bellas Hess*'s physical presence rule into the first prong of its four-part test. *Id.* at 311 ("*Bellas Hess* . . . stands for the proposition that a vendor whose only contacts with the taxing State are by mail or common carrier lacks the 'substantial nexus' required by the Commerce Clause.").

¶ 20 Citing these cases as binding precedent, Wayfair moved for, and was granted, summary judgment in its favor at the state trial court level on the grounds that it did not have substantial nexus with South Dakota due to the lack of physical presence

within the state. The South Dakota Supreme Court affirmed the lower court's decision pursuant to *Quill* and South Dakota petitioned the Supreme Court of the United States for a writ of certiorari.

¶ 21 After South Dakota had petitioned for a writ of certiorari, but before the Supreme Court agreed to hear the case, contemporary tax commentators faulted the state for drafting its Act to "attack the physical presence rule only in the context of sales taxes[,]" thereby raising the specter not only of *Bellas Hess* and *Quill*, but of *Dilworth* and its progeny. Hayes R. Holderness & Matthew C. Boch, *Did South Dakota Neglect Transactional Nexus in Its Bill to Kill Quill?*, Bloomberg BNA (Dec. 6, 2017) [hereinafter Holderness & Boch, *Did South Dakota Neglect Transactional Nexus*]. Specifically, despite a dearth of cases explicitly acknowledging such a distinction, academics had begun to identify that *Complete Auto*'s "substantial nexus" requirement could be broken down into two, separate inquiries: first, so-called "personal" or "entity nexus" which requires each taxed *entity* to have a substantial connection to the taxing state (and, under the precedent set by *Bellas Hess* and *Quill*, to maintain a physical presence within the state), and second, so-called "transactional nexus," which requires each taxed *transaction* to have a substantial connection to the taxing state. *See* Jeffrey A. Friedman & Kendall L. Houghton, *The Other Nexus: Transactional Nexus and the Commerce Clause*, 4 St. & Local Tax Law., 19, 22–33 (1999). According to some legal scholars, *Dilworth* had been incorporated in part into

*Complete Auto* through the concept of transactional nexus, and therefore states remained prohibited from imposing sales tax on transactions for goods delivered into the state by common carrier where title and possession transferred outside of the taxing state for lack of sufficient nexus even where a complementary use tax would be upheld. *See id.*; Breen M. Schiller & Daniel L. Stanley, *Nexus News: The Reemergence of Transactional Nexus*, J. St. Taxation 9, 11–12 (Winter 2021).

¶ 22 These commentators theorized that South Dakota's "oversight" in drafting its Act to require remote sellers shipping their goods into the state to collect sales tax but not use tax might impact the *Wayfair* case in one of four ways: (1) the Court might deny certiorari on the grounds that the Act addressed only sales tax; (2) the Court might grant certiorari and revisit not only *Quill*, but also *Dilworth*; (3) the Court might grant certiorari and note that South Dakota would have to extend its statute to cover use tax before it could require such tax to be collected pursuant to *Dilworth*; or (4) the Court might grant certiorari and overrule *Quill* without addressing *Dilworth* or its progeny, thereby "implicitly suggesting that the transactional nexus distinction between sales and use taxes is of little or no importance." Holderness & Boch, *Did South Dakota Neglect Transactional Nexus.* Indeed, the Court, without ever addressing *Dilworth*, overruled *Quill* and held that there was sufficient nexus between Wayfair and South Dakota for the imposition of sales tax.

¶ 23 The Supreme Court accepted South Dakota's invitation to reconsider the physical presence requirement established in *Bellas Hess* and held to have been incorporated into the *Complete Auto* test in *Quill*. The high court decided to overrule both *Bellas Hess* and *Quill* on the grounds that the "physical presence rule . . . [was] unsound and incorrect." *Wayfair,* 138 S. Ct. at 2099. The Supreme Court held that the physical presence rule was "not a necessary interpretation of *Complete Auto*'s nexus requirement" but, rather, was closely related to the minimum contacts required under the Due Process Clause of the Fourteenth Amendment. *Id.* at 2085. However, as *Quill* itself had ceded, "a business need not have a physical presence in a State to satisfy the demands of due process." *Id.* at 2093.

¶ 24 Further, the *Wayfair* Court explicitly repudiated the formalistic Commerce Clause jurisprudence of eras past as incompatible with modern legal precedents and economic realities. *Id.* at 2094. The high court pointed out the recognition that *Complete Auto* and its progeny had "eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *Id.* (quoting *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994)). The Supreme Court instead held that:

> So long as a state law avoids "any effect forbidden by the Commerce Clause," courts should not rely on anachronistic formalisms to invalidate it. The basic principles of the Court's Commerce Clause jurisprudence are grounded in functional, marketplace dynamics; and States can and should consider those realities in enacting and enforcing their tax laws.

*Id.* at 2094–95 (citation omitted). Even though the *Wayfair* Court clearly understood that South Dakota's statute at issue involved the imposition of sales tax and not use tax, nonetheless the highest tribunal did not draw any legal distinction between the two. *See Wayfair*, 138 S. Ct. at 2089 ("[T]he Act requires out-of-state sellers to collect and remit *sales tax* 'as if the seller had a physical presence in the state.' " (emphasis added) (quoting S.B. 106, § 1)). The Court did not discuss *Dilworth* or "transactional nexus" as a concept separate and apart from "substantial nexus" at all. Conversely, the Supreme Court held that, "[i]n the absence of *Quill* and *Bellas Hess*, the first prong of the *Complete Auto* test simply asks whether the tax applies to an activity with a substantial nexus with the taxing State." *Id.* at 2099. There, the high court held that the nexus between Wayfair and South Dakota was "clearly sufficient based on both the economic and virtual contacts respondents have with the State." *Id.* The Supreme Court went on to conclude that "the substantial nexus requirement of *Complete Auto* [was] satisfied in [that] case[,]" *id.* at 2099, and remanded for further proceedings not inconsistent with its decision, *id.* at 2100.

¶ 25 The significance of the *Wayfair* decision was not lost on either the states or on interstate businesses in their capacity as the states' impending taxpayers. In its wake, South Dakota and Wayfair entered into a settlement agreement by which Wayfair would collect state sales tax beginning on 1 January 2019, and many states began using South Dakota's law as a model as they adopted statutes requiring the

collection of sales tax by remote sellers. *See* Richard D. Pomp, Wayfair: *Its Implications and Missed Opportunities*, 58 J. L. & Pol'y 1, 9–10 n.55 (2019); Jennifer Karpchuk, *States Could Use Wayfair Laws To Fix Depleted Budgets*, Law360 (July 15, 2020) [hereinafter Karpchuk, *States Could Use Wayfair Laws*]. This revenue had become particularly vital as online retail transactions proliferated while states continued to contend with a public health crisis. *See* Karpchuk, *States Could Use Wayfair Laws*; *see also Wayfair*, 138 S. Ct. at 2097 ("Though *Quill* was wrong on its own terms when it was decided in 1992, since then the Internet revolution has made its earlier error all the more egregious and harmful."). In order to remain under the auspices of the *Wayfair* decision, many such states intentionally adopted those aspects of South Dakota's law that were mentioned most favorably by the Court. *See, e.g.,* Jay Hancock, *The Wayfair Sales Tax Case: Companies Without a Physical Presence Required to Collect Sales Tax*, LBMC (Mar. 1, 2022) (detailing which states adopted "economic nexus" thresholds of $100,000 or more for the imposition of sales tax on remote sellers after *Wayfair*).

¶ 26 On 7 August 2018, the North Carolina Department of Revenue issued a directive requiring remote sellers making gross sales in excess of $100,000 or conducting 200 or more separate transactions to North Carolina customers to begin collecting state sales tax in accordance with *Wayfair*. N.C. Dep't Rev., SD-18-6 (Aug. 7, 2018). This rule was limited to prospective application, which brought about

respondent's exclusion of those sales which were made by petitioner before the corporation first established a physical presence in North Carolina by hiring an in-state sales representative in September 2009. Prior to *Wayfair*, however, North Carolina's sales tax regime already paralleled South Dakota's in several key respects, given each state's membership in the Streamlined Sales and Use Tax Agreement (SSUTA). *See* An Act to Enable North Carolina to Enter the Streamlined Sales and Use Tax Agreement, S.L. 2001-347, §§ 1.1–3.3, 2001 N.C. Sess. Laws 1041, 1041–60; S.D. Codified Laws § 10-45C-3 (2010). As member-states, North Carolina's and South Dakota's tax regimes are largely governed by the same definitions and sourcing principles. As such, many aspects of their respective tax laws are nearly identical, including, *inter alia*:

| South Dakota | North Carolina |
|---|---|
| Sales tax is assessed against goods or services to be delivered into South Dakota for receipt by in-state customers. S.B. 106, § 1 (2016). | Sales are sourced to the state in which the product or service was received for the purposes of assessing sales tax. N.C.G.S. § 105-164.4B(a)(2) (2009). |
| South Dakota defines to "receive" as "(a) the taking possession of tangible personal property; (b) making first use of services; or (c) taking possession of or making first use of any product transferred electronically, whichever comes first" excluding possession by a shipping company on behalf of the purchaser. S.D. Admin. R. 64:06:01:62 (2015). | "Receipt" is defined as "taking possession of tangible personal property, making first use of services, or taking possession or making first use of digital goods, whichever comes first" but does not include possession by a shipping company on behalf of the purchaser. Sales and Use Tax Bulletin 4-1A. |
| Sales or use tax is due based on the locations to which the advertising and | Direct mail is sourced to the location where it is delivered if the purchaser |

| | |
|---|---|
| promotional direct mail is delivered. Other direct mail is sourced to the address for the purchaser contained within the seller's records. S.D. Admin. R. 64:06:01:68 (2010). | provides the seller with information to show the jurisdictions to which the direct mail is to be delivered. N.C.G.S. § 105-164.4B(d)(2) (2009). |
| A use tax is imposed for the in-state use, storage, or consumption of tangible goods at the same rate as would have been applied had the goods been purchased in South Dakota. S.D. Codified Laws § 10-46-2 (2010). | A complementary use tax applies when goods that are purchased out of state are brought into the state for their use, storage, or consumption. N.C.G.S. § 105-164.6(a)(1) (2009). |
| The imposition of state use tax is reduced by the amount of sales or use tax previously paid in another state for the same property. S.D. Codified Laws § 10-46-6.1 (2010). | North Carolina allows sellers to credit the amount of sales or use tax paid on an item in another state against the tax imposed under North Carolina law. N.C.G.S. § 105-164.6(c)(2) (2009). |
| Remote sellers are required to collect and remit sales tax as if they had a physical presence within the state if they make sales exceeding $100,000 or 200 or more separate transactions to South Dakota customers over the course of a year. S.D. Codified Laws § 10-64-2 (2016). This applies only prospectively following the passage of the Act. S.B. 106, §§ 5, 3, 8(10) (2016). | Remote sellers are only obligated to collect state sales tax if they conduct significant in-state activity such as making at least 200 separate sales or $100,000 worth of sales to in-state customers over the course of a year. This applies only prospectively beginning 1 November 2018. N.C. Dep't Rev., SD-18-6 (Aug. 7, 2018). |
| South Dakota can extract sellers' registration information from the central registration system. The state further allows sellers to register without a signature and permits agents to register on behalf of sellers. S.D. Codified Laws §§ 10-45C-3, 10-45C-5, 10-45-24 (2010). | North Carolina can extract a seller's information from the central registration system, allows sellers to register without a signature, and permits agents to register on behalf of sellers. N.C.G.S. §§ 105-164.29, 105-164.42E(4), 105-164.42I (2009). |
| South Dakota provides state-level administration of state and local sales and use taxes. Sellers are required to register, file returns, and remit funds at the state level. South Dakota requires sellers to file only one return each tax | North Carolina provides state-level administration of state and local sales and use taxes. Sellers are required to register with, file returns with, and remit funds to a state-level authority. The state requires sellers to file only |

| | |
|---|---|
| period for the state and all of its local jurisdictions. S.D. Codified Laws § 10-45C-5 (2010). | one tax return each period for the state and all local jurisdictions. N.C.G.S. §§ 105-164.16, 105-469, 105-471, 105-483, 105-498, 105-507.2, 105-509.1, 105-510.1, 105-511.3 (2009). |
| South Dakota uses the definitions provided by the SSUTA to define the following terms, *inter alia*: "bundled transaction," "delivery charges," "direct mail," "lease or rental," "purchase price," "retail sale or sale at retail," "sales price," and "tangible personal property." S.D. Codified Laws §§ 10-45-1, 10-45-1.5, 10-45-1.9, 10-45-1.12, 10-45-1.13, 10-45-1.14, 10-45-1(4), 10-45-1(10), 10-45-94.1 (2010). | North Carolina uses the SSUTA definitions to define the following terms, *inter alia*: "bundled transaction," "delivery charges," "direct mail," "lease or rental," "purchase price," "retail sale or sale at retail," "sales price," and "tangible personal property." N.C.G.S. §§ 105-164.3, 164.4D (2009). |
| South Dakota reviews sales tax software submitted for certification as Certified Automated Software (CAS) and provides liability relief to sellers for their reliance on such software. S.D. Codified Laws § 10-45C-7 (2010). | North Carolina reviews sales tax software submitted for certification as CAS and provides liability relief for reliance on such software. N.C.G.S. §§ 105-164.42H, 105-164.42I (2009). |

## C. Applying *Complete Auto*'s four-part formulation to North Carolina's tax

Because North Carolina's imposition of sales tax under the circumstances presented in this case does not differ from South Dakota's in any respect that is legally significant to this matter, and because both states have incorporated the SSUTA's uniform rules and definitions into their sales tax and use tax regimes, we follow the Supreme Court's precedent in *Wayfair* and apply the four-part test in *Complete Auto* to determine its constitutionality. Under the "now-accepted framework for state taxation" provided by *Complete Auto*, courts will sustain a tax imposed on interstate commerce as long as it: "(1) applies to an activity with a

substantial nexus with the taxing State, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services the State provides." *Wayfair*, 138 S. Ct. at 2091. We uphold North Carolina's tax against petitioner's Commerce Clause challenge because petitioner's activities have a substantial nexus with North Carolina and the imposition of sales tax on petitioner's sales to North Carolina customers is fairly apportioned, nondiscriminatory, and fairly related to the services provided by the state. We further hold that North Carolina's assessment of sales tax on the sales at issue does not offend petitioner's right to due process under the Due Process Clause of the Constitution of the United States.

### 1. *Substantial Nexus*

Despite petitioner's contention otherwise, the *Wayfair* Court addressed the first requirement of *Complete Auto*'s four-part test—substantial nexus—in its entirety by holding that, "[i]n the absence of *Quill* and *Bellas Hess*, the first prong of the *Complete Auto* test simply asks whether the tax applies to an activity with a substantial nexus with the taxing State." *Id.* at 2099. Specifically, the Supreme Court held that Wayfair's "economic and virtual contacts" provided a "clearly sufficient" nexus for the imposition of sales tax in light of the fact that South Dakota's act only applied to sellers delivering more than $100,000 worth of goods or services into the state or making 200 or more separate transactions for the delivery of goods or services into the state on an annual basis. *Id.* According to the high court, this "quantity of

business could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota." *Id.* Since a nexus is established whenever a taxpayer "avails itself of the substantial privilege of carrying on business in that jurisdiction," *Polar Tankers, Inc. v. City of Valdez*, 557 U. S. 1, 11 (2009) (quotation marks omitted), the *Wayfair* Court held that the substantial nexus requirement of *Complete Auto* had been clearly satisfied. *Wayfair,* 138 S. Ct. at 2099.

¶ 29        Although the Supreme Court of the United States in *Wayfair* did not specifically disaggregate substantial nexus into its component parts of transactional and personal nexus, it did begin its discussion by dispensing with the subject properly considered as constituting the transactional nexus issue before proceeding to the physical presence requirement as an aspect of personal nexus. The high court stated:

> All agree that South Dakota has the authority to tax these transactions. S.B. 106 applies to sales of "tangible personal property, products transferred electronically, or services *for delivery into South Dakota.*" § 1 (emphasis added). "It has long been settled" that the sale of goods or services "has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State." [*Jefferson Lines,* 514 U.S. at 184]; *see also* 2 C. Trost & P. Hartman, Federal Limitations on State and Local Taxation 2d § 11:1, p. 471 (2003) ("Generally speaking, a sale is attributable to its destination").

*Id.* at 2092–93. By citing its decision in *Jefferson Lines*, South Dakota's sourcing statute, and a treatise on federal regulation of state and local taxation, the Supreme

Court did not so much neglect transactional nexus as it summarily dismissed any notion that South Dakota might not have authority to tax the sales at issue on the grounds of both general taxing principles and the state's specific destination-based sourcing statute.

¶ 30          The facts presented in the case at bar provide equal, if not greater, support for a finding of substantial nexus. Petitioner has clearly availed itself of the substantial privilege of carrying on its own business in North Carolina through both its economic and physical contacts with the state. Petitioner processed approximately $20 million worth of orders for delivery into the state between 2009 and 2011. This is well above the annual threshold of $100,000 cited favorably in *Wayfair*. Further, unlike the remote sellers implicated in *Wayfair*, petitioner has maintained a physical presence within North Carolina for the relevant time period by employing a sales representative to solicit sales both within and from outside of the state. Finally, as a member of the SSUTA, North Carolina employs the same destination-based sourcing principles as South Dakota, which attribute a sale to the state in which the goods or services were received for the purpose of assessing state sales tax. *Compare* S.B. 106 § 1, *with* N.C.G.S. § 105-164.4B(a)(2). We therefore hold that there is also substantial nexus here.[2]

---

[2] Although the Court only reached and ruled on the issue of nexus in *Wayfair*, we note that it also looked favorably to several features of South Dakota's statute in anticipating how the Act may be further evaluated on remand:

### 2. *Fair Apportionment*

¶ 31   The second requirement of the *Complete Auto* test serves "to ensure that each State taxes only its fair share of an interstate transaction" and to prevent "multiple taxation" of the same transaction by more than one state. *Jefferson Lines*, 514 U.S. at 184–85. The Supreme Court addressed the issue of malapportionment in *Jefferson Lines* in the context of the state of Oklahoma's imposition of a state sales tax on the sale of bus tickets sold within the state for travel into other states. *Id.* at 177–78. In *Jefferson Lines*, the Court began by stating that:

> For over a decade now, we have assessed any threat of malapportionment by asking whether the tax is

---

> The question remains whether some other principle in the Court's Commerce Clause doctrine might invalidate the Act. Because the *Quill* physical presence rule was an obvious barrier to the Act's validity, these issues have not yet been litigated or briefed, and so the Court need not resolve them here. That said, South Dakota's tax system includes several features that appear designed to prevent discrimination against or undue burdens upon interstate commerce. First, the Act applies a safe harbor to those who transact only limited business in South Dakota. Second, the Act ensures that no obligation to remit the sales tax may be applied retroactively. S.B. 106, §5. Third, South Dakota is one of more than 20 States that have adopted the Streamlined Sales and Use Tax Agreement. This system standardizes taxes to reduce administrative and compliance costs: It requires a single, state level tax administration, uniform definitions of products and services, simplified tax rate structures, and other uniform rules. It also provides sellers access to sales tax administration software paid for by the State. Sellers who choose to use such software are immune from audit liability.

*Wayfair*, 138 S. Ct. at 2099–2100. Each of these features is reflected in North Carolina's own laws, as detailed in the table above.

"internally consistent" and, if so, whether it is "externally consistent" as well. Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax . . . .

External consistency, on the other hand, looks not to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State. Here, the threat of real multiple taxation (though not by literally identical statutes) may indicate a State's impermissible overreaching.

*Id.* at 185 (citations omitted).

¶ 32     The Supreme Court of the United States held in *Jefferson Lines* that Oklahoma's tax was both internally and externally consistent. *Id.* at 185–96. First, the high court determined that the tax was internally consistent because if every state were to impose an identical tax (i.e. a tax on ticket sales within the state for travel originating in that state), no sale would be subject to more than one such tax because each would be attributable to only one lone state. *Id.* at 185. And second, the

Supreme Court concluded that the tax was externally consistent because "[a] sale of goods is most readily viewed as a discrete event facilitated by the laws and amenities of the place of sale," and thus the high court had "consistently approved taxation of sales without any division of the tax base among different States" by permitting the state in which the sale is deemed to have taken place to tax the entire purchase price. *Id*. at 186. In *Jefferson Lines*, the Supreme Court declared that the sale of a bus ticket within Oklahoma for transit out of the state was properly deemed a local event because the taxable event was comprised of the "agreement, payment, and delivery of some of the services in the taxing State" and "no other State [could] claim to be the site of the same combination." *Id.* at 190. Further, "the combined events of payment for a ticket and its delivery for present commencement of a trip [were] commonly understood to suffice for a sale." *Id.* at 191. The high court therefore decided that Oklahoma could levy a sales tax upon the entire purchase price of the ticket even though the service it entailed included travel across other states. *Id.* at 186–96.

¶ 33      North Carolina's imposition of sales tax on the sales at issue in this case is likewise both internally and externally consistent. First, the tax is internally consistent because, as in *Jefferson Lines*, every state could impose an identical destination-based sales tax without any duplicative effect since each sale would only be attributable to a single state. Indeed, most states—including but not limited to, SSUTA member-states—have destination-based sourcing statutes that attribute

sales to the state in which the goods or services are to be received and impose state sales taxes accordingly. And second, the tax is externally consistent because, as the Court recognized in *Wayfair*, a sale of goods is generally attributable to its destination. *Wayfair,* 138 S. Ct. at 2092–93. Unlike Arkansas in *Dilworth*, North Carolina has state law addressing where a sale is deemed to have taken place for the purpose of assessing state sales tax. North Carolina's sourcing statute traces the sale of goods to their location of receipt and printed materials to the mailing address provided by purchasers, notwithstanding delivery to a common carrier f.o.b.[3] in another state. N.C.G.S. § 105-164.4B(a)(2), (d)(2)(b); N.C.G.S § 105-164.4E (2009). As in *Jefferson Lines*, "no other State [could] claim to be the site of the same" since each purchase of goods or materials is delivered to only one mailing address located within one destination state. North Carolina has joined a number of states which have adopted destination-based sourcing principles; beyond the twenty-three states which are members of the SSUTA, thirty-five of the fifty states in the nation, along with the District of Columbia, currently define the sale of goods according to their ultimate destination. Jennifer Faubion, Tax Burden Analysis and Review of Recent Significant Changes: Presentation to the Legislative Finance Committee (July 20, 2022), https://www.nmlegis.gov/handouts/ALFC%20072022%20Item%205%20Tax%20Burd en%20Analysis%20and%20Review%20of%20Recent%20Significant%20Changes.pdf.

---

[3] "F.o.b." is an abbreviation for "free on board."

This list of states includes Wisconsin—the state in which petitioner maintains its headquarters and from which petitioner ships many of its orders—whose sourcing rules are materially identical to North Carolina's sourcing rules as a fellow SSUTA member. Wis. Stat. § 77.522(1)(b), (1)(c) (2010). Consequently, none of these states will assess duplicate sales tax, since they all define a sale as occurring at the point of destination: one address located within one state. Finally, North Carolina and other states provide an additional safeguard against multiple taxation by providing a credit to sellers in the amount of any sales tax or use tax already paid on a particular purchase. N.C.G.S. § 105-164.6(c)(2) (2009).

¶ 34       For these reasons, we hold that North Carolina's assessment of sales tax on the sales at issue is as externally consistent as it is internally consistent.

### 3. *Nondiscrimination*

¶ 35       The requirement that a tax imposed on interstate commerce be nondiscriminatory serves to avoid the "multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause," *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356 (1951), by preventing states from "providing a direct commercial advantage to local business," *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959); *see also Maryland v. Louisiana*, 451 U.S. 725, 754 (1981). A law is therefore discriminatory if it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the

State." *Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984). On the other hand, a tax structure that applies the same rate to in-state and out-of-state transactions and provides a credit for those taxes paid in another state is nondiscriminatory as a matter of law. *See D.H. Holmes,* 486 U.S. at 32 ("The Louisiana tax structure likewise does not discriminate against interstate commerce. The use tax is designed to compensate the State for revenue lost when residents purchase out of state goods for use within the State. It is equal to the sales tax applicable to the same tangible personal property purchased in-state . . . .").

¶ 36        Here, North Carolina imposes the same sales tax on all purchases made for delivery to North Carolina customers regardless of the origin of the goods or the location of the seller. Further, the state maintains a complementary tax structure that imposes sales tax and use tax at an equal rate and provides a credit against the assessment of use tax for sales tax paid to another state. N.C.G.S. § 105-164.6(a), (c)(2). As such, North Carolina does not impose any greater burden on the purchase of goods from out of state than it does on transactions which are entirely intrastate. Therefore, the tax is nondiscriminatory as a matter of law.

### 4. *Fair Relation*

¶ 37        The fourth and final prong of the *Complete Auto* test requires that the assessment of tax be fairly related to services provided by the state to its taxpayers. However, the state does not need to provide a "detailed accounting" of the services

provided to each taxpayer based on the taxpayer's in-state activities; instead, the

state may simply demonstrate the provision of ordinary public services which are

advantageous to the execution of the taxpayer's business within the state. In *D.H.*

*Holmes*, for instance, the Supreme Court found that:

> *Complete Auto* requires that the tax be fairly related to benefits provided by the State, but that condition is also met here. Louisiana provides a number of services that facilitate Holmes' sale of merchandise within the State: It provides fire and police protection for Holmes' stores, runs mass transit and maintains public roads which benefit Holmes' customers, and supplies a number of other civic services from which Holmes profits. To be sure, many others in the State benefit from the same services; but that does not alter the fact that the use tax paid by Holmes, on catalogs designed to increase sales, is related to the advantages provided by the State which aid Holmes' business.

*D.H. Holmes*, 486 U.S. at 32. Similarly, in *Jefferson Lines*, the high court found that:

> The fair relation prong of *Complete Auto* requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor, indeed, is a State limited to offsetting the public costs created by the taxed activity. If the event is taxable, the proceeds from the tax may ordinarily be used for purposes unrelated to the taxable event. Interstate commerce may thus be made to pay its fair share of state expenses and " 'contribute to the cost of providing all governmental services, including those services from which it arguably receives no direct 'benefit.' " The bus terminal may not catch fire during the sale, and no robbery there may be foiled while the buyer is getting his ticket, but police and fire protection, along with the usual and usually forgotten advantages conferred by the State's maintenance of a civilized society, are justifications enough for the imposition of a tax.

*Jefferson Lines*, 514 U.S. at 199–200 (quoting *Goldberg v. Sweet*, 488 U.S. 252, 267 (1989)). As with Louisiana in *D.H. Holmes* and Oklahoma in *Jefferson Lines*, North Carolina requires interstate taxpayers like petitioner to pay their "fair share" of those ordinary public services that aid their in-state business activities, including police and fire protection, mass transit and public roads, and those other "forgotten advantages conferred by the State's maintenance of a civilized society." *See Jefferson Lines*, 514 U.S. at 200. For this reason, we hold that the assessment of sales tax upon the sales at issue in this case is fairly related to North Carolina's provision of public services to its taxpayers, including petitioner.

### 5. *Due Process*

¶ 38      Finally, we hold that petitioner has been afforded due process of law. The Due Process Clause "limits States to imposing only taxes that 'bea[r] fiscal relation to protection, opportunities and benefits given by the state.' " *N.C. Dep't of Revenue v. Kimberly Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2219 (2019) (alteration in original) (quoting *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444 (1940)). "The [U.S. Supreme] Court applies a two-step analysis to decide if a state tax abides by the Due Process Clause." *Id.* at 2220. First, there must be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Quill*, 504 U.S. at 306 (quoting *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 344–45 (1954)). Second, "income attributed to the State for tax purposes must be rationally

related to 'values connected with the taxing State.' " *Id.* at 306 (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 273 (1978)).

¶ 39          Petitioner and its sales have a definite connection to North Carolina. As in *Quill* and *Wayfair*, petitioner in the present case is engaged in "continuous and widespread solicitation of business" within North Carolina, amounting to millions of dollars' worth of sales for delivery into the state. *See Quill*, 504 U.S. at 308. This level of activity suffices to give petitioner "fair warning" that its activities may be subject to the state's jurisdiction. *See id.* Further, this activity is rationally related to values connected with North Carolina since, as discussed above, the sales at issue can be properly traced to the state through the application of North Carolina's sourcing statute.

¶ 40          Additionally, the Supreme Court has held that the "*Complete Auto* test, while responsive to Commerce Clause dictates, encompasses as well . . . due process requirement[s]." *Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 373 (1991). As such, the high court acknowledged the possibility that "every tax that passes contemporary Commerce Clause analysis [may also be] valid under the Due Process Clause," even though the converse is not necessarily true. *Quill*, 504 U.S. at 313 n.7. Although we do not presume to conclusively decide that this will hold true in all circumstances, nonetheless the above analysis demonstrating the satisfaction of *Complete Auto*'s four factors provides significant additional support for our conclusion

in the case at bar that North Carolina's assessment of the sales tax at issue comports with the Due Process Clause. We therefore hold that North Carolina's imposition of sales tax on the sales involved in this case does not offend the Due Process Clause of the Constitution of the United States.

## III. Conclusion

¶ 41　　Based upon the reasons discussed above, we hold that the formalism doctrine established in *Dilworth* has not survived the subsequent decisions of the Supreme Court of the United States in *Complete Auto* and *Wayfair* so as to render the sales tax regime of North Carolina violative of the Commerce Clause and the Due Process Clause of the Constitution of the United States. Further, North Carolina's imposition of sales tax on the transactions at issue in this case is constitutional under the relevant test provided by *Complete Auto*. Accordingly, we reverse the Business Court's order and opinion and hold in favor of respondent.

REVERSED.

Justice BERGER dissenting.

As the trial court correctly noted, resolution of this case is determined by response to one question: "is the holding in *Dilworth* the controlling law." In answering in the affirmative, the trial court invalidated assessment of the sales tax against Quad Graphics by the North Carolina Department of Revenue because the Supreme Court of the United States has not overruled *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 64 S. Ct. 1023, 88 L. Ed. 1304 (1944). The trial court's decision should be affirmed because this Court is not permitted to disregard the Supreme Court's interpretation of the Commerce Clause and the federal Constitution. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22, 104 L. Ed. 2d 526 (1989) (holding that when United States Supreme Court precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"). Therefore, I respectfully dissent.

The transaction at issue in the present case is strikingly similar to the one addressed in *Dilworth*. There, Arkansas sought to impose a sales tax upon Tennessee companies for the sale of machinery and mill supplies out of offices located in Memphis, Tennessee, which utilized a Tennessee salesman to solicit sales in Arkansas. *Dilworth*, 322 U.S. at 328, 64 S. Ct. at 1024. Orders for goods were

required to be approved by the Memphis office and would come to Tennessee by mail or phone. *Id.* at 328, 64 S. Ct. at 1024. Further, title of the goods passed upon delivery to the carrier in Tennessee, and payment of the sales price was not made in Arkansas. *Id.* at 328, 64 S. Ct. at 1024–25. Simply, *Dilworth* involved "sales made by Tennessee vendors that are consummated in Tennessee for the delivery of goods in Arkansas." *Id.* at 328, 64 S. Ct. at 1025. The U.S. Supreme Court observed that it "would have to destroy both business and legal notions to deny that under these circumstances the sale—the transfer of ownership—was made in Tennessee." *Id.* at 330, 64 S. Ct. at 1025. Thus, the Supreme Court held that an Arkansas sales tax on transactions completed by Tennessee companies and consummated in Tennessee violated the Commerce Clause of the U.S. Constitution. *Id.* at 329–30, 64 S. Ct. at 1025.

¶ 44 Here, Quad Graphics, received orders and produced printed materials outside of the State of North Carolina. Once the printed materials were produced, they were delivered to the United States Postal Service or another common carrier—all outside of North Carolina. Then, the common carrier would deliver the materials to customers or direct mail recipients within North Carolina. In accordance with the contracts between the parties, title to the printed material and risk of loss passed when the materials were provided to the common carrier for shipping. As in in *Dilworth*, the sale—"transfer of ownership"—was completed outside of North Carolina such that petitioner was "through selling" before the materials reached the

state. *See Dilworth*, 322 U.S. at 330, 64 S. Ct. at 1025. Quad Graphics later hired a North Carolina-based sales representative to solicit orders in North Carolina; however, all orders had to be approved and accepted through the company's Wisconsin headquarters.

¶ 45        In 2011, the North Carolina Department of Revenue attempted to assess a sales tax against Quad Graphics for transactions which occurred from 2007 through 2011, even though transfer of title and possession of the printed material to its customers occurred outside of North Carolina. Quad Graphics contends that under these circumstances, and pursuant to *Dilworth*, imposition of the sales tax is suspect under the Commerce Clause of the federal Constitution because the sale did not occur in North Carolina.

¶ 46        Citing to *Dilworth*, the Supreme Court of the United States has stated that

> where a corporation chooses to stay at home in all respects
> except to send abroad advertising or drummers to solicit
> orders which are sent directly to the home office for
> acceptance, filling, and delivery back to the buyer, it is
> obvious that the State of the buyer has no local grip on the
> seller. Unless some local incident occurs sufficient to bring
> the transaction within its taxing power, the vendor is not
> taxable.

*Norton Co. v. Dep't of Revenue of State of Ill.*, 340 U.S. 534, 537, 71 S. Ct. 377, 380, 95 L. Ed. 517 (1951).

¶ 47        To determine whether the tax at issue comports with the Commerce Clause, we must examine whether the tax is "applied to *an activity* with a substantial nexus

with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State." *Complete Auto Transit, Inc. v. Brady*, 430 U.S 274, 279, 97 S. Ct. 1076, 1079, 51 L. Ed. 2d 326 (1977) (emphasis added). Thus, one focus of the first prong in *Complete Auto* test is the link between the transaction and the state, which some legal observers have termed a transactional nexus. *See* Hayes R. Holderness, *Navigating 21st Century Tax Jurisdiction*, 79 Md. L. Rev. 1, 9 (2019).

¶ 48        Another focus of the first prong is what has come to be known as personal nexus as discussed in *Wayfair*. Personal nexus is the link between the taxpayer and the state. *Id.* The majority devotes much of its analysis to this issue. Notably, the Supreme Court in *Wayfair* only addressed personal nexus. The Court did not address the transactional nexus—leaving that aspect of *Dilworth* undisturbed. *See South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 201 L. Ed. 2d 403 (2018) (discussing only the business's connection with the taxing state—personal nexus—rather than the transaction's connection to the taxing state—transactional nexus). The Court left open the possibility that the tax at issue in *Wayfair* could have been subject to other Commerce Clause challenges which were not reached in the opinion. *Id.* at 2099–2100. Therefore, *Wayfair* speaks only to the personal nexus aspect of the substantial nexus test and does not apply to the issue in this case—an issue of transactional nexus.

¶ 49 It should be noted that just because the Department could not levy a *sales* tax on the transaction at issue, it does not follow that the State was without options. The Department could have applied a use tax without running afoul of the Commerce Clause. The Court in *Dilworth* addressed whether Arkansas could have levied a *use* tax rather than a *sales* tax and determined that such a tax was not chosen by Arkansas and was therefore not before the Court. *Dilworth*, 322 U.S. at 330, 64 S. Ct. at 1025. But the Court went on to note that there was a real difference in the transactions permitting levy of sales or use taxes:

> A sales tax and a use tax in many instances may bring about the same result. But they are different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds. A sales tax is a tax on the freedom of purchase . . . . A use tax is a tax on the enjoyment of that which was purchased. In view of the differences in the relation of the taxing state to them, a tax on an interstate sale like the one before us and unlike the tax on the enjoyment of the goods sold, involves an assumption of power by a State which the Commerce Clause was meant to end.

*Id.* at 330, 64 S. Ct. at 1025–26.

¶ 50 The Court further concluded that "[t]hough sales and use taxes may secure the same revenues and serve complementary purposes, they are . . . taxes on different transactions and for different opportunities afforded by a State." *Id.* at 331, 64 S. Ct. at 1026. A use tax would likely pose no constitutional issue if it had been chosen by

the Department of Revenue. *See Gen. Trading Co. v. State Tax Comm'n of Iowa*, 322 U.S. 335, 337–38, 64 S. Ct. 1028, 1029, 88 L. Ed. 1309 (1944).

¶ 51 While the Department and the majority express concern that Quad Graphics may not be paying its fair share in state taxes, any loss of revenue here is a direct result of the Department's decision to levy a sales tax. While a taxpayer certainly has an obligation to pay taxes owed, it is not a charity, and the government is required to assess the appropriate tax. While some may deem this a "formalistic" requirement, such a requirement touches on fundamental fairness for taxpayers.

¶ 52 In this case, the Department of Revenue chose to levy a *sales* tax on a transaction which concluded outside of the state. Under *Dilworth* and the facts of this case, that violates the Commerce Clause. Had the Department chosen a *use* tax, the result here might be different. Contrary to the facts in *Wayfair*, it is the Department's choice of a tax, and not Quad Graphics's effort to avoid taxes, that brings this constitutional quandary before this Court.

¶ 53 Because *Dilworth* applies in this case and defines the location of a sale based upon "practical notions of what constitutes a sale," *Dilworth*, 322 U.S. at 329, 64 S. Ct. at 1025, and the transaction here occurred outside of North Carolina, I would conclude that the tax violates the Commerce Clause as applied to Quad Graphics and affirm the Business Court's order.